**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: mcohen@rosenlegal.com

*Counsel for Plaintiffs*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW FINCH and ERNST TEUFEL BEJARANO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNICOIN, INC. f/k/a TransparentBusiness, Inc., ALEXANDER KONANYKHIN, MARIA SILVINA MOSCHINI, ALEJANDRO DOMINGUEZ, and RICHARD DEVLIN, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Matthew Finch and Ernst Teufel Bejarano ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: review and analysis of news reports, press releases, websites, and other publicly available reports and information about Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action on behalf of persons and/or entities who purchased or otherwise acquired Unicoin Rights Certificates (the "Certificates") from Defendants.

2.      From Unicoin's New York City headquarters, Defendants launched a massive – and extremely deceptive – public marketing campaign designed to hawk worthless certificates known as Unicoin Rights Certificates. This campaign was very successful, as they sold over 100 million dollars of the Unicoin Rights Certificates to an unsuspecting public.

3.      Defendants' marketing efforts emanated broadly, but targeted New York City with particular vigor. For instance, Defendants ran advertisements on thousands of New York City taxi cabs, buses and ride-share cars, New York Waterway ferries, LinkNYC public wi-fi kiosks, and office building elevator screens in New York City, including in Manhattan; they sponsored high-visibility digital billboards in public spaces such as Times Square, the entrance to the Holland Tunnel, and all three major New York City-area airports.

4.      In addition, Defendant Konanykhin regularly issued so-called "Investor Updates" throughout the relevant period, posting them to the Company's public website. These were periodic promotional communications, authored by Defendant Konanykhin and disseminated to the Company's large email distribution list of actual and potential investors, and others who signed

up for updates and provided Unicoin with their contact information, as a way of stirring up public interest in the Certificates.

5.     The Defendants also posted so-called private placement memoranda ("PPMs") on their public website as solicitations throughout the relevant period, as well as hundreds if not thousands of tweets and posts on Instagram, Facebook, LinkedIn, and Unicoin's website, all of which were publicly accessible, highly misleading promotional materials.

6.     Defendants' public advertisements, PPMs, Investor Updates and social media posts were all part of a vast marketing campaign designed to drum up interest in the Unicoin Rights Certificates. As detailed in this Complaint, they were all filled with lies.

7.     Defendants also took various public actions to maintain the illusion of an impending Unicoin IPO, including posting pictures of themselves at the Nasdaq and NYSE stock exchanges on Unicoin's and their own social media accounts, and conducting paid interviews at the Nasdaq and NYSE exchanges in front of backgrounds displaying the Nasdaq and NYSE logos.

8.     In fact, in 2024 alone, Unicoin's "sales and marketing expenses" – which consisted of "third-party marketing, advertising, and branding in addition to compensation and benefits of the Company's own marketing personnel" – exceeded $14 million. Unicoin spent approximately $6 million on sales and marketing in 2023 and approximately $17.8 million in 2022.

9.     Behind Defendants' lavish marketing campaign stood a singular goal: to convey the false and misleading impression that the Unicoin Rights Certificates constituted safe, legally compliant and highly-sought-after "next-generation" crypto assets.

10.     In reality, however, the Unicoin Rights Certificates were nothing more than worthless unregistered securities that Defendants issued in violation of state and federal law, and almost everything that Defendants said when marketing them to unsuspecting investors was a lie.

11.     For instance, while Defendants claimed in numerous public forums that the Unicoin tokens that would underlie the Unicoin Rights Certificates were asset-backed by billions of dollars in real estate and equity interests in promising pre-IPO companies, in reality, these assets were never worth more than a small fraction of the values that the Defendants publicly attributed to

them. In any event, the Company never intended to back the Unicoin tokens or Unicoin Rights Certificates with any such assets. The Company never even distributed the Unicoin tokens at all, leaving Plaintiffs and others holding only worthless Certificates.

12.    Plaintiffs and other Class Members were not aware that Defendants' public statements about the Unicoin Rights Certificates were false, and, in fact, only began to learn the truth when the SEC brought an enforcement action in May of 2025, accusing Defendants of wide-ranging fraud and revealing the depth of the lies behind Defendants' false advertising campaign that has saturated the airwaves for years.

13.    Now aware of the truth, Plaintiffs bring this action to recover the damages incurred as result of Defendants' extensive and deceptive marketing scheme.

## **PARTIES**

14.    Plaintiff Matthew Finch (or "Finch") is a resident of Ontario, Canada. Plaintiff Finch and the other members of the Class purchased Certificates during the Class Period.

15.    Plaintiff Ernst Teufel Bejarano (or "Teufel Bejarano") is a resident of San Jose, Costa Rica. Plaintiff Teufel Bejarano and the other members of the Class purchased Certificates during the Class Period.

16.    Defendant Unicoin, Inc., f/k/a TransparentBusiness, Inc., was incorporated in 2015 in Delaware. Unicoin has claimed to have facilities in Nevada, New York, California, New Mexico, Texas and Florida. As of December 31, 2024, Unicoin's principal executive office was located at 228 Park Avenue South, New York, New York. In addition, Unicoin's website appears to give the impression that it is based in the World Trade Center in New York, New York:



## How Can We Help You?

Visit our **Help Center**
Talk to our Team: **support@unicoin.com**

1 World Trade Center
85th Floor
New York, NY 10007

### Sign Up for Unicoin Upda

your@emailaddress

   

17.     Although Unicoin's common stock is registered pursuant to Section 12(g) of the Exchange Act, it is not and has never been publicly traded over the counter or on any national securities exchange.

18.     Defendant Alexander Konanykhin is the chief executive officer ("CEO") of Unicoin. From March 2024 to the present, he has been chairman of Unicoin's board of directors. Konanykhin owns 36% of Unicoin's common stock and controls the Company's operations and decision-making. Upon information and belief, Defendant Konanykhin is a citizen of New York.

19.     Defendant Maria Silvina Moschini was Unicoin's president and chairwoman of Unicoin's board of directors from 2015 to March 2024. She left Unicoin's board of directors in March 2024 and rejoined Unicoin's board of directors on or about June 28, 2024. Since 2021, Moschini has been CEO of Unicorns, Inc., an operating subsidiary of Unicoin. Moschini owns 36.6% of Unicoin's common stock. Upon information and belief, Defendant Moschini is a citizen of New York.

20.     Defendant Alejandro Dominguez was Unicoin's chief investment officer from December 2023 through August 17, 2024. Prior to that, from April 2022 to December 2023,

Dominguez served as Unicoin's investor relations officer and from March 2022 to April 2022 he served as its vice president of corporate development.

21.     Defendant Richard Devlin has been senior vice president and general counsel of Unicoin from June 2020 through the present. In February 2023, Devlin was also named secretary of Unicoin.

22.     Defendants Unicoin, Konanykhin, Moschini, and Dominguez are collectively known as the "Promoting Defendants."

23.     Defendants Konanykhin, Moschini, Dominguez, and Devlin are collectively referred to as the "Individual Defendants."

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one plaintiff and defendant are citizens of different states).

25.     This Court may exercise personal jurisdiction over Defendants because Defendants either reside in or maintain business in this District, maintain and have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. § 1965. Defendants centered their misconduct in this Judicial District and promoted, advertised, and hyped up the worthless Certificates in this Judicial District. Moreover, subsequent damages took place in this Judicial District.

27.     Venue and jurisdiction are additionally proper in this District because many of the acts complained of herein, including the dissemination of materially false and misleading statements originated and/or occurred, at least in part, in this Judicial District. Further, Defendants sought investors in this Judicial District and encouraged their investment in the Certificates.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the  Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the Unicoin Rights Certificates during the relevant period (the "Class Period"). Excluded from the Class are corporate officers, members of the boards of directors, and senior executives of Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.

30.     The Class is readily ascertainable and identifiable. It can be identified by reference to Defendants' own databases and records.

31.     Plaintiffs will fairly and adequately protect the interests of the Class because Plaintiffs' claims are typical and representative of the claims of all members of the Class.

32.     Plaintiffs' claims are typical of the claims of all Class members, as all members of the Class are similarly affected by Defendants' wrongful and illegal conduct.

33.     There are no unique defenses that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiffs are typical of other members of the Class, do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and have no conflict with any other members of the Class.

34.     Plaintiffs have retained competent counsel experienced in class action litigation to represent themselves and the Class.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> (a)     Whether Defendants' marketing campaign for the Unicoin Rights Certificates violated applicable law;
>
> (b)     to what extent Plaintiffs and the members of the Class have sustained damages, and the proper measure of those damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

37.     In the absence of a class action, Defendants will – contrary to public policy – retain the benefits of their wrongful conduct described herein.

## **BACKGROUND ABOUT UNICOIN**

38.     Unicoin was formerly known as TransparentBusiness, Inc. ("TransparentBusiness"), which was incorporated in Delaware on June 22, 2015.

39.     On October 6, 2022, TransparentBusiness changed its name to "Unicoin, Inc."

40.     For the sake of clarity, this Complaint refers to both Unicoin, Inc. and TransparentBusiness as "Unicoin" or "the Company."

41.     In April 2021, Unicoin acquired a 66.67% ownership interest in Unicorns, Inc., a media company founded by Defendant Konanykhin, which produced a streaming reality series called "Unicorn Hunters."

42.    "Unicorn Hunters" showcased private companies seeking publicity for their private securities offerings by appearing on the show. In return for featuring these private companies on the show, Unicorns, Inc. received equity, stock options, or warrants in certain of those companies.

43.    In or around February 2022, Unicoin pivoted to focus primarily on offering and selling rights to to-be-issued digital assets known as "Unicoins."

44.    At all relevant times, Defendant Konanykhin controlled and managed Unicoin's operations, and all senior Unicoin executives directly or indirectly reported to him.

## DEFENDANTS LAUNCH A VAST AND MISLEADING MARKETING SCHEME TO SELL THE UNICOIN RIGHTS CERTIFICATES

45.    From around 2022 to 2025, the Company offered and sold crypto assets known as Unicoin Rights Certificates. The Company marketed these Certificates using a variety of deceptive and public-facing means, including: posting false and misleading private placement memoranda (the "PPMs") to its public website; blasting false and misleading Investor Updates to its email distribution list; releasing a multitude of false and misleading tweets and other public statements; and running an extensive marketing campaign that included paid advertisements, sponsorships and appearances, all designed to sell the Unicoin Rights Certificates to an unsuspecting public.

46.    Around March 2022, Unicoin posted to its publicly accessible website a so-called PPM, dated February 7, 2022, entitled "Initial Coin Offering" (the "February 7, 2022, PPM").

47.    The February 7, 2022, PPM detailed the terms of the Company's offer and sale of the Unicoin Rights Certificates. These Unicoin Rights Certificates purportedly entitled buyers to "pre-purchase and reserve . . . UniCoins, which are securities tokens being developed for future issuance."

48.    The February 7, 2022, PPM, which set the selling price of Unicoin Rights Certificates at $0.05 per Unicoin, was the first of many, nearly-identical PPMs that Unicoin disseminated widely to investors and potential investors throughout the relevant period. As Unicoin arbitrarily increased the price at which it was selling Unicoin Rights Certificates, it issued updated PPMs on its website to reflect the price increases.

49.     While each PPM purported to limit participation to a specific group of investors, i.e., accredited U.S. investors, non-U.S. persons, or existing Unicoin shareholders, the PPMs were disseminated publicly and served as solicitation for Defendants' highly deceptive offering.

50.     Notwithstanding minor differences in pricing and eligibility, the PPMs set forth nearly identical terms, granting to all Unicoin Rights Certificate purchasers the same rights to receive fungible Unicoin tokens if and when they were minted and distributed.

51.     For instance, the Company's February 7, 2022, PPM made the following representations:

• UniCoins will be used to develop a diversified portfolio of equity positions in numerous emerging growth and other early- or growth-stage companies, the best out of the numerous applicants to our Unicorn Hunters show. Coin holders will, therefore, be stakeholders of a major global fund of innovations and will receive dividends when distributed by UniCoins, Inc., our to-be-formed subsidiary that will be issuing the UniCoins.

• We believe that as a value-backed superior alternative to Bitcoin and other cryptocurrencies not backed by any assets, UniCoin will be less volatile, and this lack of volatility may also cause UniCoins' value to rise even when the more volatile coins fall. When the broader cryptocurrency markets rise, UniCoin is expected to also rise with the market.

• We plan to use the reach and the credibility of Unicorn Hunters and its media partners to create high name recognition of Unicoin.

• When funds and/or securities or other assets are available for distribution as dividends, TransparentBusiness, as the creator of UniCoins and manager of the UniCoins ecosystem, will be paid 20% of the funds available for distribution, as a management fee. TransparentBusiness or its Unicoins subsidiary shall be required . . . to distribute dividends to UniCoin holders in an amount that is not less than 10% of the liquid assets generated by our diversified portfolio of equity positions per year. Some of the investment profits will be used to purchase massive brand visibility for UniCoin and cover the operational costs of the UniCoin ecosystem. Any remaining profits shall be held and used for general corporate purposes and growth, or higher distribution amounts to UniCoin holders, at the discretion of the Company's board and management.

52.     UniCoin made similar claims in its subsequent PPMs for its offering of Unicoin Rights Certificates, including, but not limited to, PPMs pertaining to the offer and sale of Unicoin

Rights Certificates dated March 5, 2022, September 1, 2022, November 15, 2022, March 1, 2023, and April 1, 2024.

53.    To date, Unicoin has still not publicly distributed the Unicoin tokens and has offered for sale only Unicoin Rights Certificates.

54.    Defendant Devlin was primarily responsible for drafting the PPMs that Unicoin disseminated to the public in order to promote the Unicoin Rights Certificates to potential investors and the public.

55.    Defendants Devlin and Konanykhin shared authority over the content of Unicoin's PPMs.

56.    In addition to publicizing the false and misleading PPMs, Unicoin's website, which contains a New York choice of law provision, includes payment instructions. The website instructs that all wire transfers be sent to Unicoin, Inc.'s checking account with the beneficiary address of 228 Park Ave S, Pmb 16065, New York, NY 10003.

57.    If paying by check, Unicoin's website states that: "You can mail your check to: Unicoin Inc. 228 Park Ave S, Pmb 16065, New York, NY 10003."

58.    When Plaintiffs purchased the Unicoin Rights Certificates, they were interacting with Defendants in New York, New York.

59.    The metadata reflect that the operative documents originated in New York, New York

60.    The operative documents were digitally signed by the purchaser of the Certificates, as well as Defendant Konanykhin as "CEO."

61.    During the relevant period, the Company broadly marketed Unicoin Rights Certificates to the public through extensive advertising and promotional efforts aimed at potential investors in the United States and abroad, including running advertisements on high-traffic news media websites such as The New York Times, The Dallas Morning News, the Chicago Tribune, the Los Angeles Times, the Inquirer, the Wall Street Journal, Bloomberg, Axios, CNN, MarketWatch, USA Today, and Fox Business.

62.     The Company's marketing efforts, though designed to suck in dollars from around the world, targeted New York City in particular. Defendants ran advertisements on thousands of taxi cabs, wrapped buses and ride-share cars, New York Waterway ferries, LinkNYC public wi-fi kiosks, and office building elevator screens in New York City, including in Manhattan. Defendants also sponsored high-visibility digital billboards in public spaces such as Times Square, the entrance to New York's Holland Tunnel, and the major New York Cirt airports, in addition to major international airports in San Francisco, Los Angeles, Denver, and Miami.

63.     In 2024 alone, Unicoin's "sales and marketing expenses" – which consisted of "third-party marketing, advertising, and branding in addition to compensation and benefits of the Company's own marketing personnel" – exceeded $14 million. Unicoin spent approximately $6 million on sales and marketing in 2023 and approximately $17.8 million in 2022.

64.     The Promoting Defendants also promoted the Company's offer and sale of Unicoin Rights Certificates through speaking engagements and appearances at financial industry and crypto community conferences and shareholders' meetings, which they recorded and posted to Unicoin's website.

65.     The Promoting Defendants also made hundreds if not thousands of promotional tweets and posts to Instagram, Facebook, LinkedIn, and the Company's own website. These were publicly accessible worldwide.

66.     In addition, Defendants Unicoin and Konanykhin regularly issued false and misleading Investor Updates, which were periodic promotional communications that Konanykhin authored, posted on one of the Company's public unrestricted websites, and disseminated to the Company's large email distribution list of actual and potential investors, as well as others who signed up for updates and provided Unicoin with their contact information.

67.     Defendant Konanykhin was responsible for the content of these Investor Updates, and he signed each one with his name and title, "CEO, Unicoin, Inc." (or TransparentBusiness, depending on the date). The Investor Updates were another means of advertisement and solicitation for the Unicoin Rights Certificates.

**The Promoting Defendants Misrepresent Key Characteristics of Unicoin Rights Certificates and Unicoin Tokens**

68.     During the relevant period, the Promoting Defendants materially misrepresented key attributes of the to-be-distributed Unicoin tokens, claiming Unicoin tokens were, or would be, "asset-backed" or "equity-backed," and "SEC-registered," "U.S. registered" or "SEC-compliant," when they were not.

69.     These misrepresentations were particularly significant because the Promoting Defendants expressly pointed to them as selling points that purportedly distinguished Unicoin tokens from so-called "first-generation" crypto assets like bitcoin.

70.     The Promoting Defendants repeated and amplified these false claims in an effort to entice investors to purchase Unicoin Rights Certificates and thereby reserve future Unicoin tokens.

1.  **The Promoting Defendants Falsely Claim Unicoin Tokens Would be "Asset-backed" or "Equity Backed"**

71.     During the relevant period, the Promoting Defendants repeatedly and falsely claimed that Unicoin tokens were, or would be, "asset-backed" or "equity-backed."

72.     For example, in a February 2022 Investor Update, Konanykhin described Unicoin tokens as "equity-backed" and included a graphic calling Unicoin tokens "dividend-paying and backed by a Global Innovation Fund."

73.     The February 7, 2022, PPM for Unicoin Rights Certificates provided more detail, stating, "Unicoin tokens will be used to develop a diversified portfolio of equity positions in numerous emerging growth and other early- or growth-stage companies, the best out of the numerous applicants to our Unicorn Hunters show. Coin holders will, therefore, be stakeholders of a major global fund of innovations and will receive dividends when distributed by UniCoins, Inc., our to-be-formed subsidiary that will be issuing the UniCoins."

74.     Unicoin repeated this misrepresentation from its February 7, 2022, PPM, discussed in the preceding paragraphs, in its subsequent PPMs, including, but not limited to, PPMs pertaining

to the offer and sale of Unicoin Rights Certificates dated March 5, 2022, September 1, 2022, November 15, 2022, March 1, 2023, and April 1, 2024.

75.     The Company also characterized Unicoin tokens as "asset backed" in paid advertisements.

76.     For example, on March 29, 2022, a paid Unicoin video advertisement appeared at the end of a Washington Post online article headlined, "The Evolution of Money: Cryptocurrency." The promotional video featured an interview with one of Unicoin's then-directors, who stated, "[F]or the first time, you'll be able to actually invest in a crypto securitized coin that will actually be used to create a Global Innovation Fund . . . . When you buy Unicoin, in essence you are getting a sliver of a portfolio of emerging growth companies, of an equity stake I should say, in these emerging growth companies."

77.     Defendant Dominguez, as Unicoin's chief investment officer, also falsely promoted Unicoin tokens as "asset backed." For example, on August 9, 2022, at a blockchain-focused conference (the "Blockchain Conference"), Dominguez delivered a speech in which he claimed that Unicoin tokens are "going to be the first coin that's actually equity-backed and pays dividends like a traditional stock would." Dominguez' speech was made publicly available on YouTube.

78.     During Defendant Dominguez's speech to the Blockchain Conference, he displayed a graphic on a screen behind him that stated, "Unicoin is an equity-backed, dividend-paying cryptocurrency."

79.     Defendant Konanykhin continued to describe Unicoin tokens in numerous Investor Updates throughout 2023 as "asset-backed" or "equity-backed"; "U.S.-registered" or "SEC-compliant"; "publicly reporting"; "regulations compliant"; "dividend-paying"; and "audited."

### 2.  Neither Unicoin Rights Certificates Nor Unicoin Tokens were Asset-Backed

80.     The Promoting Defendants' statements, above, claiming that Unicoin tokens were or would be "asset-backed" – by interests in private start-up companies and/or other valuable assets like real estate – were false and materially misleading.

81.    By stating that Unicoin tokens were "asset-backed," the Promoting Defendants intentionally created the false impression that the Unicoin tokens were secured by, or otherwise granted investors interests in, a portfolio of real-world assets, rendering them safer and more stable investments than other existing crypto assets.

82.    When the Promoting Defendants made these statements, however, they knew or recklessly disregarded that neither Unicoin tokens nor Unicoin Rights Certificates were asset-backed, and that the Promoting Defendants did not intend and never had intended that they would be asset-backed.

83.    In fact, no steps have been taken to securitize (or otherwise "back") Unicoin tokens with real world assets. Unicoin's chief financial officer ("CFO") identified this issue as early February 2022, when he advised Defendants Konanykhin, Moschini, and Devlin (as well as certain Unicoin board members) not to "say [Unicoin tokens are] backed by a find [sic] since a fund has not been technically set up."

84.    In spite of their numerous statements that Unicoin would be "asset-backed," the Promoting Defendants never actually intended for Unicoin tokens to be backed by any assets. Defendants Konanykhin, Moschini, and Dominguez have each admitted in sworn testimony that they never intended that any assets would "back" Unicoin tokens. Comparing cryptocurrency to a physical product like a bottle of water, Konanykhin testified that it "cannot be backed by something or reporting, et cetera."

85.    Defendant Moschini testified under oath that when she called Unicoin "asset-backed," she meant only that the Company owned assets.

86.    Contrary to his many public statements about Unicoin, Defendant Dominguez testified under oath, "So we don't say, you know, the coin [Unicoin] is backed by assets."

87.    Consistent with the Promoting Defendants' sworn testimony that they did not intend Unicoin tokens to be backed by assets, a draft version of the smart contract (a digital program stored on a blockchain that is executed automatically when certain predefined conditions are satisfied, with the outcome of any execution recorded to the blockchain) that purportedly was

meant to govern the Unicoin tokens contained no feature or indication that its functionality would be tied to real-world triggering events, such as a liquidation of a real world asset.

### 3. The Promoting Defendants Falsely Represent that Unicoin Rights Certificates and Unicoin Tokens are "SEC-Registered" or "US-Registered" and "SEC-Compliant

88.     In an effort to paint Unicoin tokens and Unicoin Rights Certificates as safer investments than other existing crypto assets, the Promoting Defendants repeatedly and falsely claimed that Unicoin tokens were "SEC-registered" or "U.S.-registered" and "SEC-compliant."

89.     For example, a December 16, 2022, Unicoin press release quoting Defendant Konanykhin described the Unicoin token as "an SEC-registered security token [that] offers a transparent, legitimate, and positive outlook for the future of the crypto market."

90.     A January 26, 2025, International Business Times online article that Defendant Moschini disseminated in a LinkedIn post on February 10, 2025, described the Unicoin token as "the only cryptocurrency that is U.S.-registered, U.S.-based, U.S-regulated, U.S.-audited, and U.S.-publicly reporting."

91.     Similarly, a January 16, 2025, Investor Update circulated by Defendant Konanykhin linked to an Investing.com article that said, "Konanykhin said that Unicoin is uniquely positioned as a U.S.-registered, U.S.-audited, and U.S.-regulated cryptocurrency."

92.     On February 21, 2025, Defendant Konanykhin issued an Investor Update advocating for inclusion in any future U.S. crypto stockpile "U.S.-registered, U.S.-based, U.S.-regulated, U.S.-audited, and U.S.-publicly-reporting cryptocurrencies (like Unicoin) over foreign cryptocurrencies like Bitcoin."

93.     In fact, neither Unicoin tokens nor Unicoin Rights Certificates were ever "registered" with the Commission, or any other U.S. regulator.

94.     Unicoin never filed a Securities Act registration statement with the Commission to register its offering of Unicoin Rights Certificates or to register the Unicoin Rights Certificates as a class of securities under Section 12 of the Exchange Act.

95.     Due to their senior executive positions within the Company, the Promoting Defendants knew or recklessly disregarded that their statements that Unicoin had registered Unicoin tokens or Unicoin Rights Certificates were false.

96.     In addition, contrary to the Defendants' representations, Unicoin Rights Certificates were not "SEC-compliant," as they were offered for sale in violation of the registration requirements of the federal securities laws and riddled with false and misleading statements.

## The Promoting Defendants Drastically Overstate the Amount and Value of Unicoin Rights Certificates Sold

97.     In addition to misrepresenting the fundamental characteristics of the Unicoin Rights Certificates and underlying Unicoin tokens, the Promoting Defendants repeatedly overstated the Company's Unicoin Rights Certificate sales figures to create the illusion of high public interest and a "growing demand" for Unicoin Rights Certificates.

98.     The misleading impression of surging demand was a key component of Defendants' deceptive marketing scheme. Unicoin then relied on this purportedly "growing demand" to justify repeated price increases and boost their offering proceeds.

99.     In fact, Unicoin included within its publicly stated sales figures "deferred" sales of Unicoin Rights Certificates for which investors were not obligated to pay and, as the Promoting Defendants were aware, for which many investors did not intend to pay.

### 1. The Promoting Defendants' Funding "Milestone" Announcements Overstate Sales of Unicoin Rights Certificates

100.     Since October 2022 the Promoting Defendants have made dozens of announcements on social media and in Investor Updates, promotional interviews, and speaking engagements, touting Unicoin's purported fundraising "milestones," each of which substantially overstated the Company's sales of Unicoin Rights Certificates and materially inflated its fundraising success, misleading the public.

101.    In an Investor Update he circulated on October 10, 2022, Defendant Konanykhin announced that "investors have purchased over $100 million of unicoins, [ ] an important milestone reached by only a few cryptocurrencies."

102.    In a subsequent Investor Update on October 17, 2022, Defendant Konanykhin announced that Unicoin had reached the "$150 million milestone"" – specifically stating that "we've sold over $150 million worth of unicoins!"

103.    On November 1, 2022, Unicoin issued a press release announcing that the Company had "reached the milestone of $200 million in sales of unicoins to individual and corporate investors" and claiming that "more than 2 billion unicoins have been purchased by investors from around the world." A similar statement posted the next day to the "news" page on Unicoin's website stated, "Unicoin Presale Exceeds $200 Million"; and a public tweet sent that day from the Company's X account touted, "We have OFFICIALLY reached the milestone of $200 million in sales." Less than two hours later, Defendant Moschini sent a similar tweet from her X account, with a link to Unicoin's press release.

104.    Defendant Konanykhin repeated the Company's November 1, 2022, claim in a January 11, 2023, Investor Update that he emailed to Unicoin's email distribution list and posted to one of Unicoin's websites. Defendant Konanykhin wrote, "In November, we reported reaching $200M in sales" and claimed that "many investors recognize that Unicoin is a solution to the extreme volatility of the early crypto coins," which is "why our sales have greatly accelerated."

105.    On December 16, 2022, Unicoin disseminated a number of announcements claiming that it had sold $250 million worth of Unicoin tokens: it announced on X that it had "surpassed the milestone of $250 million in sales of unicoins, with 50 million sold in less than two months"; Defendant Moschini tweeted about this purported milestone, writing, "A quarter of a billion dollars invested in @Unicoin_news, our official Crypto, an assets-backed coin that is designed for stability and profitability"; and a press release that Unicoin posted to the "news" page on its website "announced today that its pre-sale of unicoins purchased by individual and corporate investors has reached $250 million . . . an increase of $50 million in less than two months,

demonstrating that the crypto market can thrive with next-generation, assets-backed, and regulated coins that provide investors with real value."

106.    Defendant Konanykhin also touted Unicoin's $250 million sales claim in a December 15, 2022, Investor Update that he sent to Unicoin's email distribution list and posted to one of Unicoin's websites.

107.    The Promoting Defendants' false and misleading "milestone" announcements continued throughout 2022, 2023, and 2024.

108.    For instance, on January 4, 2023, Unicoin tweeted, "🚨New Year, New Milestone 🚨 $275 million dollars worth of Unicoin sold!" Defendant Moschini tweeted a similar announcement and Defendant Konanykhin repeated this claim in an Investor Update.

109.    On January 11, 2023, Unicoin tweeted and posted to Instagram, "Remember the $300 million? Nah, that's old news already! 😁 Today, merely two days later, we're pleased to announce that we've reached the $350M milestone in Unicoin sales! 🚀 We're skyrocketing to greatness with all of you!" Moschini tweeted a similar announcement and Konanykhin repeated this claim in an Investor Update.

110.    On March 3, 2023, Unicoin tweeted, "We're pleased to announce that we've reached the $375M milestone in Unicoin sales!" Defendant Moschini tweeted a similar announcement and Defendant Konanykhin repeated this claim in an Investor Update. Unicoin also repeated this claim in a press release.

111.    On March 15, 2023, Unicoin tweeted, "[W]e've reached a new milestone: $400M in Unicoin sales!" Defendant Moschini tweeted a similar announcement and Defendant Konanykhin repeated this claim in an Investor Update. Unicoin and Defendant Konanykhin posted similar announcements on their LinkedIn pages.

112.    These public, promotional statements were false and misleading. Contrary to those statements, Unicoin's 1Q2024 10-Q—which, like all of the Company's Forms 10-Q and Forms 10-K was signed by Defendant Konanykhin—reflected a total Unicoin Rights Financing

Obligation of only $39.7 million and only $2.2 million in "proceeds from sales of Unicoin rights" that quarter.

113.    Defendants Unicoin, Konanykhin and Moschini made similar "milestone" announcements in the second quarter of 2023.

114.    For instance, on April 4, 2023, Unicoin tweeted, "We're thrilled to announce that we've hit $425 million in @Unicoin_News sales!" Defendant Konanykhin repeated this claim in an Investor Update. Unicoin also posted this announcement on its LinkedIn page.

115.    On April 26, 2023, Unicoin tweeted, "Our Unicoin sales have surged past the $450 million mark!" Defendant Moschini tweeted a similar announcement and Defendant Konanykhin repeated this claim in an Investor Update.

116.    On May 8, 2023, Unicoin tweeted, "Another monday, another milestone! We've hit another significant milestone on our journey to democratize wealth creation and transform the investing and transacting landscape. Our Unicoin sales have skyrocketed and surpassed the $475 million mark." Defendant Moschini tweeted a similar announcement and Defendant Konanykhin repeated this claim in an Investor Update. Unicoin also posted this announcement on its LinkedIn page.

117.    On June 8, 2023, Unicoin tweeted, "Half a BILLION worth of Unicoin has successfully been sold! 🎉 After months of hard work, dedication, and the unwavering support from our community, we are thrilled to announce that we have sold a staggering $500 million worth of Unicoin!" Defendant Moschini tweeted a similar announcement, and Defendnat Konanykhin repeated this claim in an Investor Update. Unicoin also posted this announcement on its LinkedIn page.

118.    Defendants Unicoin's, Konanykhin's and Moschini's statements in paragraph 132, above, were false, or at least misleading. Contrary to those statements, Unicoin's 2Q2023 10-Q reflected a total Unicoin Rights Financing Obligation of only $48.4 million and only $7.8 million in "proceeds from sales of Unicoin rights" that quarter.

119.    Later announcements claimed ever-higher sales figures, with Unicoin Rights Certificates sales purportedly reaching $2 billion by March 2024. By June 2024, the Promoting Defendants claimed to have "exceeded $3B in Unicoin sales." Specifically, on June 9, 2024, Defendant Moschini announced on her LinkedIn page, "I am pleased to share with you that we have achieved $3 billion in Unicoin sales! . . . Our record-breaking pre-ICO sales enabled us to start a massive branding campaign using a wide range of advertising options, including TV, online, print, events, and OOH advertising . . . prior to our ICO." Defendnats Konanykhin and Dominguez similarly touted the purported $3 billion milestone on LinkedIn the same day.

120.    These statements were false and misleading. At each purported "milestone," the Unicoin Rights Financing Obligation Unicoin reported in the Company's corresponding periodic SEC filing showed that it had raised far less than the Promoting Defendants claimed.

121.    Far from the $3 billion in Unicoin Rights Certificates the Promoting Defendants claimed to have sold by June 2024, the Company's reported Unicoin Rights Financing Obligation shows that it had raised, at most, $110 million.

### 2.    Defendants' "Milestone" Announcements Include Incomplete Sales

122.    One way that Unicoin overstated its sales milestones was by improperly including, among other things, unpaid balances from deferred "sales" of Unicoin Rights Certificates. They did so under a program by which investors could secure a five-year option to purchase Unicoin Rights Certificates by pledging as collateral 20% of the total anticipated purchase price (the "Five Year Plan").

123.    More than 75% of participants in the Five Year Plan pledged their previously received Unicoin Rights Certificates or Unicoin stock as collateral, meaning the Company received no additional cash from the pledged collateral.

124.    The Promoting Defendants knew that Unicoin had not actually received – and were not obligated to receive – the deferred "sale" amounts under the Five Year Plan. Yet they nonetheless included the full Five Year Plan "sales" amounts in calculating the Unicoin Rights

Certificates sales figures, thus claiming sales five times larger than what Unicoin had actually sold, misleading the public.

### **Defendants Misrepresent Unicoin's Acquisition of Real Estate**

125.    During the relevant period, Defendants repeatedly misrepresented Unicoin's ownership of and/or the value of real estate assets that Unicoin claimed to have acquired pursuant to what was known as the 140% program.

126.    In particular, Defendants made numerous misrepresentations and material omissions regarding four large property transactions between August 2023 and January 2024: in (1) Argentina, (2) Thailand, (3) Antigua, and (4) the Bahamas.

127.    The Promoting Defendants publicly claimed that these four properties had appraised values ranging from $150 million dollars to $680 million dollars, for a combined total of more than $1.4 billion dollars.

128.    But as they knew or recklessly disregarded, the Promoting Defendants had no reasonable basis to represent that the properties were worth anywhere near as much as they claimed. In fact, the properties were worth only a small fraction of the amounts the Promoting Defendants claimed.

129.    The Promoting Defendants also claimed that Unicoin had acquired the real properties at issue – with Defendant Devlin claiming that Unicoin had acquired the Bahamas properties – when, in fact, Unicoin had not (and, in all but one case, still has not) acquired these properties.

### 1.  **Argentina**

130.    Between August 2023 and May 2024, Defendants Unicoin and Konanykhin made numerous false and misleading statements about mining rights concessions that Unicoin purportedly acquired in Argentina (the "Argentine Mining Rights").

131.    Defendants Unicoin and Konanykhin repeatedly represented to the public that the Argentine Mining Rights were valued at $150 million when, in fact, they knew or recklessly disregarded that the Company had not received an appraisal at the time it announced the acquisition and had no reasonable basis to publicly claim the Argentine Mining Rights were worth $150 million.

132.    In the August 16, 2023, press release announcing the transaction, Unicoin claimed, "Unicoin, an assets-backed cryptocurrency that addresses the extreme volatility of the crypto market, announced today that it signed an agreement with . . . an Argentine corporation, to acquire from [it] the rights to explore and exploit mineral rights located in Argentina, primarily copper."

133.    That press release continued, "The purchase price shall be paid in unicoins. The acquisition is structured pursuant to Unicoin's program of acquiring real estate assets at 140% of their appraised value for unicoins, at an agreed value of $0.50 per unicoin. Unicoin Inc. agreed to pay [the Argentine company] 420,000,000 unicoins for the acquisition, a $210M value at the 50¢/ú [Unicoin token] price investors currently pay for unicoins."

134.    After the announcement of the Argentine Mining Rights transaction, Defendants Unicoin and Konanykhin repeatedly touted the purported total value of the transaction.

135.    For instance, on February 23, 2024, Unicoin posted a video to its LinkedIn page claiming that the Argentine Mining Rights were "part of our portfolio," had a "$150M investment value," and were part of the "$1.4Bn in assets" that "backed" Unicoin tokens.

136.    Also, on May 22, 2024, during a presentation at a digital assets conference in San Francisco, Unicoin's CFO claimed that in his role he was "focused on the actual asset values, or the appraisal values," of the properties Unicoin was acquiring through its "140% program," and highlighted Unicoin's acquisition of "$150 million mining rights in Argentina," showing a slide claiming that those rights had an "[a]ppraised value [of] $150M."

137.    These statements about the Argentine Mining Rights transaction were false for at least two reasons: (1) at that time, Unicoin had not obtained an appraisal of the Argentine Mining

Rights; and (2) in fact, the Argentine Mining Rights were worth just a fraction of the value that Unicoin announced.

138.    At the time Unicoin claimed to have acquired the Argentine Mining Rights, Defendants had not received any appraisal for the property. Defendants would not receive an appraisal for the property until more than a year later, in November 2024.

139.    On November 4, 2024, nearly 15 months after Unicoin announced the Argentine mining rights acquisition, the Company received for the first time an appraisal of the Argentine Mining Rights. This appraisal valued the Argentine Mining Rights at $7.1 million—less than 5% of the $150 million that Unicoin had announced in August 2023 and repeatedly touted to the public through mid-2024.

### 2.  Thailand

140.    Between September 2023 and May 2024, Defendants Unicoin and Konanykhin made numerous false and misleading statements about a property that Unicoin purportedly had acquired in Thailand (the "Thailand Property").

141.    Defendants Unicoin and Konanykhin repeatedly represented to the public that the Thailand Property was valued at $241 million when, in fact, they knew or recklessly disregarded that the Company had not yet received an as-is appraisal of the Thailand Property, and the Thailand Property was actually worth far less than $241 million.

142.    At the time of Unicoin's statements the Thailand Property was worth no more than $15 million as-is.

143.    On August 22, 2023, the seller of the Thailand Property provided Defendant Dominguez with a so-called "appraisal" for the Thailand Property, valuing it at $241 million (the "Seller's Appraisal"), which Defendant Dominguez shared with Defendants Konanykhin and Moschini.

144.    However, this $241 million valuation in the Seller's Appraisal reflected the total anticipated cost of constructing a resort on the completely undeveloped Thailand Property, not an as-is market value for the property.

145.    In August 2023, the as-is market value of the Thailand Property was no more than $15 million.

146.    In fact, the Seller's Appraisal itself stated that the market value of the undeveloped Thailand Property was less than $10 million.

147.    Defendants Konanykhin and Dominguez knew that the Seller's Appraisal was based on an expected future cost of the constructed project, not the then-current market value of the Thailand Property.

148.    Notwithstanding the $10 million as-is valuation stated in the Seller's Appraisal, Defendants Unicoin and Konanykhin announced and then repeatedly touted the Thailand Property transaction as a $335 million acquisition, implying a $241 million valuation after accounting for Unicoin's "140% program."

149.    For example, on September 29, 2023, Unicoin issued a press release announcing its acquisition of the Thailand property headlined, "Unicoin Makes History with $335M Thailand Luxury Resort Acquisition, the Largest Ever Property-for-Crypto Deal."

150.    The September 29, 2023, press release stated that Unicoin had "signed a landmark $335 million agreement to purchase Eden Grand Resort, a development project for a 64,000 square meter property and luxury resort in Chonburi, Thailand – the largest-ever real estate acquisition made with cryptocurrency."

151.    The press release continued, "The purchase price shall be paid in unicoins. The acquisition is structured pursuant to Unicoin's program of acquiring real estate assets at 140% of their appraised value for unicoins. Unicoin Inc. agreed to pay [the Thailand Property seller] 671,206,755 unicoins for the acquisition, a $335.6M value at the 50¢/ú [Unicoin] price investors currently pay for unicoins."

152.    On October 2, 2023, Unicoin filed with the SEC a current report on Form 8-K attaching the September 29, 2023, press release.

153.    Unicoin's September 29, 2023, Facebook post claimed that "Unicoin is expanding its global portfolio, acquiring the Eden Grand Resort in Thailand in the biggest-ever crypto-for-real estate deal at $335M!" It also included a video claiming, "Unicoin Makes History with $335M Thai Luxury Resort Acquisition."

154.    Defendants Unicoin and Konanykhin's statements about the Thailand Property acquisition were false and misleading because they materially inflated the stated value of the Thailand Property that Unicoin claimed to have acquired. The inflated value was improperly based on the anticipated cost of constructing a large resort complex rather than the market value of the property at the time of the transaction.

### 3.   <u>Antigua</u>

155.    In October 2023, Defendants Unicoin and Konanykhin made multiple false and misleading statements about two properties Unicoin purportedly had acquired in Antigua (the "Antigua Properties"). Defendants Unicoin and Konanykhin represented that the Antigua Properties were valued at $680 million when, in fact – as they knew or recklessly disregarded – the Company had not received an appraisal at the time it announced the acquisition, and serious doubts existed about the seller's claimed $680 million valuation for the Antigua Properties.

156.    Beginning in September 2023, pursuant to its "140% program," Unicoin engaged in discussions about acquiring the Antigua Properties – two adjoining parcels of land in Antigua and Barbuda that together combined into a 394.6-acre property – in exchange for Unicoin rights Certificates.

157.    During negotiations with Defendnats Konanykhin and Dominguez, the seller's representative claimed that the Antigua Properties were worth $680 million. Dominguez has acknowledged that he had doubts about that claimed value.

158.    In fact, Defendants Dominguez and Konanykhin were aware or quickly learned of numerous red flags regarding the reliability of the purported $680 million valuation.

159.    The only support Antigua Properties seller's representative provided Dominguez and Konanykhin for his $680 million valuation was a two-page list of comparable properties that the seller's representative himself had compiled.

160.    On September 22, 2023, Konanykhin and Dominguez discussed in a WhatsApp chat other properties listed for sale in Antigua with much lower per-acre prices than the Antigua Properties. Those other property listings suggested that the actual value of the Antigua Properties was less than $100 million. Among other things, on or before September 22, 2023, Dominguez and Konanykhin had become aware that a real estate agency had created an online listing in 2020 purporting to sell for $40 million a 400-acre parcel of land in the same location in Antigua.

161.    During his September 22, 2023, private discussion with Defendant Dominguez, Defendant Konanykhin noted that "the real value of what [the Antigua Properties seller's representative] offers may indeed be under $40M."

162.    On September 27, 2023, Defendant Dominguez shared with Defendant Konanykhin links to New York and Grenada court opinions showing that, in 2002, the Antigua Properties seller's representative had been disbarred as an attorney in New York and had been found to pose "an immediate threat to the public interest" after failing to respond to ten complaints of professional misconduct; and, in 2014, had been disbarred as an attorney in Grenada for failing to disclose the New York disbarment in his Granada bar application.

163.    Despite the red flags about the property's valuation and about the seller's representative, which had led Defendant Dominguez to contact an Antigua appraiser to obtain a price opinion (from whom he had not yet received a response), Defendant Konanykhin announced the acquisition of the Antigua Properties in an investor update on October 17, 2023.

164.    In the October 17, 2023, Investor Update, Konanykhin stated, "I just signed a deal for acquiring, in exchange for unicoins, 394.6 acres of premium coastal land in the Caribbean, valued at US$680M."

165.    Unicoin also promoted the acquisition to the public on its various social media platforms.

166.    For example, on October 23, 2023, the Unicoin Instagram account made a post claiming, "We've done it again – our biggest deal yet: 394.6 acres of premium coastal land in the Caribbean, valued at US$680M!" An accompanying video touted a "$680M Coastal Caribbean Paradise Added to Our Assets!" The same post was made by the Company's LinkedIn and X accounts on the same day.

167.    On that same day, the local appraiser Dominguez had contacted in Antigua informed him that the Antigua Properties were worth only $50 million. On October 30, 2023, Dominguez shared the $50 million price opinion with Konanykhin and also discussed with him a due diligence report that Konanykhin had separately requested, which, among other things, suggested a property value of between $59 and $392 million. Dominguez commented, "Wow, seems like too many issues with [the seller's agent] and land seems iffy."

168.    Defendant Unicoin and Konanykhin's claims that the Antigua Properties were worth $680 million were false, as its actual market value at the time was no more than $89 million, and misleading because they did not disclose the red flags and lack of reasonable basis for the valuation.

### 4. **Bahamas**

169.    Between January and June 2024, Defendants made multiple false and misleading statements about Unicoin's purported acquisition of the beneficial ownership in two entities that claimed to own three properties in the Bahamas purportedly valued at $396 million.

170.    The Promoting Defendants repeatedly touted Unicoin's acquisition of the Bahamas properties, although they knew of or recklessly disregarded serious red flags about the sellers' actual ownership of the properties.

171.    Defendant Dominguez represented to the public that Unicoin had closed its acquisition of the Bahamas properties while knowing or recklessly disregarding that the transaction had not closed. To date, Unicoin still has not closed the acquisition.

172.    Defendant Devlin also highlighted the acquisition of the Bahamas properties in at least one PPM while omitting material information concerning the serious red flags about the sellers' actual ownership of the properties and the incomplete status of the acquisition, both of which Defendant Devlin knew or should have known when he drafted the PPM.

173.    In July 2023, Defendants Konanykhin and Dominguez began a series of extensive discussions and communications with the representative of sellers of property in the Bahamas regarding Unicoin's potential acquisition of those properties.

174.    Defendants Devlin and Moschini also participated in a WhatsApp group chat with the sellers' representative in which they were updated on the status of the acquisition as the negotiations progressed.

175.    The parties ultimately settled on Unicoin acquiring beneficial ownership in two entities, Long Island Investments Ltd. and Newport Harbour Ltd. (the "Bahamas Entities") – which purportedly owned three parcels of land located on Long Island, Cat Island, and Andros Island in the Bahamas – for a total of 7,721 acres (collectively, the "Bahamas Properties"), in exchange for Unicoin Rights Certificates.

176.    At the outset of their discussions to acquire the Bahamas Properties, Defendants Konanykhin and Dominguez became aware of red flags about the potential transaction, including prior allegations of fraud regarding the sellers and doubts about the sellers' ownership of the Bahamas Properties they were purporting to sell.

177.    In a September 8, 2023 WhatsApp conversation following a telephone conference call among Defendants Konanykhin, Dominguez, Devlin, Unicoin's CFO, the Bahamas Entities' representative, and an associate of the representative working on the transaction (the "Associate"), Defendant Dominguez sent Defendant Konanykhin a WhatsApp message containing a link to a press release issued by the United States Department of Justice ("DOJ Press Release"), which

identified the Associate as a convicted felon who had been sentenced in 2015 to 12.5 years in prison for defrauding more than 100 investors out of more than $8 million in a Bahamas land development scheme.

178.    Defendant Dominguez commented on the DOJ Press Release in an accompanying WhatsApp voice message to Defendant Konanykhin, stating, "[A]ll these guys sound pretty shady. They don't want to be on video, etc. And we already know [the Bahamas Entities' representative] is a little shady. So I went ahead and Googled them and there you go. Incredible. But I don't know. Definitely don't think we should do any business with these people. . . . They're gonna send us some proposition for $400 million worth of the land in the Bahamas. Who knows if they even own it."

179.    By December 12, 2023, the Bahamas Entities' representative shared appraisals for the Bahamas Properties with Konanykhin, Moschini, and Devlin. Information contained in the appraisals raised serious concerns about whether the Bahamas Entities held marketable title to the properties.

180.    For example, although the Bahamas Entities' representative claimed that the Cat Island property was a vacant parcel of land, the appraisal for that property stated there were "several residences[,] government offices, a bank[,] and convenience stores" already located on the Cat Island property; that "many of the residents" on the Cat Island parcel "claim[ed] that they had been given the land and resided on it for many years"; and that, "many roads were also cut into the property as if [it had] been sold for subdivision use."

181.    In a November 27, 2023, group chat with, among others, Defendants Konanykhin, Moschini, and Devlin, Defendant Dominguez alluded to the title issues discussed in paragraphs 260-263, above, stating, "[W]e have not received anything from a registry [i]n Bahamas showing true ownership of [l]and. They mentioned that doesn't exist in BAHAMAS. I indeed find that hard to believe and a bit shady."

182.    Nonetheless, Unicoin conducted little or no additional investigation regarding who held title to the Bahamas Properties prior to announcing the transaction.

183.    On January 24, 2024, despite the red flags discussed above and known to Defendants, Unicoin signed an agreement with the Bahamas Entities to acquire the Bahamas Properties.

184.    On February 1, 2024, Unicoin issued a press release announcing that it had entered into an agreement to acquire beneficial ownership interests in the Bahamas Entities (and, in turn, beneficial ownership of the Bahamas Properties) (the "Bahamas Properties Press Release").

185.    The Bahamas Properties Press Release was entitled, "Unicoin Inc, Announces the Acquisition of Land Holdings in the Bahamas via the Largest-ever Crypto Deal in Real Estate, Valued at $554M."

186.    In fact, the market value of the Bahamas Properties at the time of the acquisition was no more than $132 million.

187.    The Bahamas Properties Press Release also claimed that the purported acquisitions "represent Unicoin's commitment to aggressively acquire tangible, income-generating assets. As the company continues its remarkable rise, the possibilities remain boundless. This record-shattering deal cements Unicoin's status as an unstoppable crypto pioneer, forging the future of finance."

188.    Defendants Konanykhin and Moschini approved the Bahamas Properties Press Release before the Company issued it.

189.    The Company's social media accounts also immediately began to tout Unicoin's purported acquisition of the Bahamas Properties.

190.    For example, a February 2, 2024, post on Unicoin's official Instagram account announced, "the acquisition of beneficial ownership interest in companies holding prime land holdings in the Bahamas," in what the post claimed was "the largest-ever cryptocurrency real estate deal in history." An accompanying video claimed that the deal "propell[ed] the total value of our portfolio to $1.4 billion."

191.    Defendant Konanykhin also touted the Company's acquisition of the Bahamas Properties in his Investor Updates.

192.    For example, in a February 2, 2024, Investor Update entitled "Unicoin makes a $554M deal, setting a new record," Defendant Konanykhin stated that he was "pleased to share with you a news report about our new record-shattering deal."

193.    Defendant Devlin also highlighted the acquisition in an April 26, 2024, PPM he drafted relating to Unicoin's general sale of its common stock (the "April 26, 2024, PPM"). In the April 26, 2024, PPM, Defendant Devlin stated that "[o]n April 2, 2024, the Company indirectly acquired beneficial ownership of 7,721 acres of land located in the Bahamas, including Long Island and Andros Island, by purchasing all of the issued and outstanding shares of each of Long Island Investments Ltd. and Newport Harbour Ltd., the owners of the land."

194.    These statements regarding Unicoin's acquisition of the beneficial ownership to the Bahamas Entities – and thus to the Bahamas Properties – failed to disclose that the Bahamas Entities were connected to prior land frauds; that several of the Defendants had doubts about whether the Bahamas Entities owned the Bahamas Properties; and that the appraisals provided to Unicoin for the Bahamas Properties raised serious questions about whether the Bahamas Entities held marketable title to the Bahamas Properties.

195.    In addition, Defendants Dominguez and Devlin falsely represented that the Bahamas Properties acquisition was closed, even as Dominguez knew or recklessly disregarded, and Devlin knew or should have known that it was not.

196.    For his part, at the March 26, 2024, Unicoin annual shareholders' meeting, Defendant Dominguez told Unicoin shareholders that the acquisition of the Bahamas Entities was closed and that it would appear in Unicoin's financial statements in its 1Q2024 10-Q.

197.    In fact, as of March 26, 2024, Unicoin's purported acquisition of the Bahamas Properties had not closed. Indeed, the previous day (March 25, 2024), Dominguez had told Unicoin's CFO that the Bahamas acquisition had not yet closed.

198.    These statements regarding Unicoin having purportedly completed its acquisition of the Bahamas Property were false, as the acquisition has still not closed.

**Based Largely on the Purported Acquisitions Discussed Above, Defendants Falsely Claim that Unicoin Had Acquired A Real Estate Empire Worth More Than a Hundred Million, and at Times, Billions of Dollars**

199.    At various points throughout the relevant period, Defendants falsely and misleadingly claimed that Unicoin had acquired from more than one hundred million to billions of dollars of real estate when, in fact, Unicoin had acquired real estate worth nowhere near this much.

200.    For example, at a November 6, 2023, special meeting of Unicoin's shareholders, Defendant Moschini said: "We are now in a position to tokenize and list Unicoin [tokens], with a growth of over 4900%, sales that have exceeded over $500 million, and assets in real estate that are exceeding $1.2 billion."

201.    In addition, in a November 14, 2023, presentation at a digital assets conference in New York City, Defendant Konanykhin told attendees that Unicoin had "done $1.2 billion worth of swaps of Unicoin [tokens] for real estate and other assets, equity, primarily real estate, which gives investors a very convenient opportunity to enter in crypto without using any cash, instead by utilizing, by using underutilized real estate properties."

202.    In its February 15, 2024, and February 27, 2024, PPMs offering Unicoin Rights Certificates – which Defendant Devlin drafted, and which he and Defendant Konanykhin approved – Unicoin told investors, "As of December 31, 2023, we had fully closed two acquisitions having a combined value of approximately $151 million" and "As of December 31, 2023, we have sold . . . approximately $211,820,000 through our real estate acquisition program."

203.    In a February 28, 2024, fireside chat at a summit in Doha, Qatar, Defendant Moschini claimed, "We went the regulatory way, we went to address the issues related to traditional cryptocurrencies like the high volatility, backing Unicoin with assets . . . . By now we have $1.5 billion in real estate assets backing the regulated, transparent coin that we built under SEC regulation."

204.    On March 26, 2024, at Unicoin's annual shareholder meeting, Defendant Dominguez repeated his earlier claim about Unicoin's purported real estate portfolio, asserting

that the Company had closed real estate deals valued at $1.4 billion and that "all that land comes . . . with no liens, no mortgages. We don't owe anything on these pieces of land."

205.    Unicoin and Konanykhin continued to represent publicly that Unicoin had acquired real estate assets worth billions of dollars. For example, in an April 22, 2025, Investor Update, Konanykhin falsely claimed that Unicoin had "[c]losed over $2.5B of 'Real Estate for unicoins' deals."

206.    Defendants, who were aware of the truth regarding Unicoin's transactions, knew or recklessly disregarded that these representations concerning the value of Unicoin's real estate was false.

### Plaintiffs and Class Members Begin to Learn the Truth

207.    Plaintiffs and the other Class Members were not aware that Defendants' public statements about the Unicoin Rights Certificates were false. Plaintiffs and the other Class Members only began to become aware of the truth when the SEC brought an enforcement action in May of 2025. *SEC v. Unicoin, Inc., f/k/a Transparent Business, Inc.*, 25-cv-04245 (S.D.N.Y.). The SEC's Complaint, Dkt. No. 1., unearthed the extent of the wide-ranging deception of Defendants' misleading marketing practices, and is hereby incorporated by reference herein.

### FIRST CLAIM FOR RELIEF
**Violations of the New York Deceptive Acts and Practices Act**
**N.Y. Gen. Bus. Law § 349**
**(Against All Defendants)**

208.    Plaintiffs repeat and re-allege each and every allegation contained above.

209.    Plaintiffs purchased the Unicoin Rights Certificates and have been subjected to Defendants' scheme to mislead and deceive the marketplace, and assert this claim on behalf of the Class. At the time of the purchase, Plaintiffs did not know of the vast deception in Defendants' marketing campaign for the Unicoin Rights Certificates, and accordingly paid a premium for the Certificates.

210.    Defendants engaged in deceptive and unfair practices prohibited by New York General Business Law § 349 by, among other things, misleading Plaintiffs and others into believing that the Certificates were stable, legal crypto assets that were backed by billions of dollars of real estate and other assets. Defendants took advantage of Plaintiffs' trust and confidence by deceptively promoting the sale of the Certificates, and misrepresenting their key attributes and sales figures.

211.    Defendants' materially misleading promotion of the Certificates renders those promotions and communications unlawful.

212.    The unfair and deceptive trade acts and practices of Defendants are consumer-oriented, are materially misleading, and have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and the other members of the Class.

213.    As a direct consequence of Defendants' unfair conduct and deception, Plaintiffs and members of the Class have been damaged in that they spent money on The Certificates that they would not have otherwise spent. In addition, Plaintiffs and members of the Class did not receive a lasting value for The Certificates, which Defendants misrepresented and are substantially worthless.

214.    Defendants' acts and practices amount to acts, uses, or employment by Defendants of deception and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of New York General Business Law § 349, deeming deceptive and unfair acts and practices illegal.

## SECOND CLAIM FOR RELIEF
**Violations of the New York False Advertising Act**
**N.Y. Gen. Bus. Law § 350**
**(Against All Defendants)**

215.    Plaintiffs repeat and re-allege each and every allegation contained above.

216.    Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

217.    The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.

218.    Defendants caused to be made or disseminated throughout New York and beyond, statements that were untrue or materially misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the other members of the Class.

219.    Defendants violated the NY FAA, as Defendants deceptively and misleadingly marketed Certificates as stable, legally compliant, and asset-backed, none of which was true and when, in reality, the Certificates were substantially worthless.

220.    Had Plaintiffs and the Class known the truth, they would not have purchased the Certificates at the prices they did, or at all.

221.    Accordingly, Plaintiffs and the Class overpaid for the Certificates and did not receive the benefit of the bargain for these assets.

### THIRD CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against All Defendants)**

222.    Plaintiffs repeat and re-allege each and every allegation contained above.

223.    Plaintiffs conferred a monetary benefit upon Defendants, and Defendants accepted funds that they knew, or should have known, were derived from their misleading business practices.

224.    With Plaintiffs' money, Defendants enriched themselves.

225.    Defendants have knowledge of the benefits that Plaintiffs conferred on them.

226.    Under principles of equity and good conscience, Defendants should not be permitted to retain the funds and assets they received as a result of their misleading promotion of these misrepresented Certificates to the unknowing Plaintiffs.

227.    As a result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

228.    To the extent permitted by law, Plaintiffs seek restitution of all funds and assets that Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

a)    That the Court determine that this action may be maintained as a class action, that Plaintiffs be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b)    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the laws set forth above;

c)    That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

d)    That the court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled;

e)    That the Court award Plaintiffs and the Class pre- and post-judgment interest;

f)    That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

g)    That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 24, 2025                    **THE ROSEN LAW FIRM, P.A.**


                                        /s/ *Phillip Kim*
                                        Phillip Kim, Esq.
                                        Laurence M. Rosen, Esq.
                                        Michael Cohen, Esq.
                                        275 Madison Avenue, 40th Floor

New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: mcohen@rosenlegal.com

*Counsel for Plaintiffs*